NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 26, 2025

S25A0816.  ALLEN v. THE STATE.

MᴄMɪʟʟɪᴀɴ, Justice.

Elibra Allen appeals from his convictions for malice murder and other crimes in connection with the shooting death of Frederick Greene Emereje.[1] On appeal, Allen alleges that the evidence was

---

[1] The crimes were committed on February 15, 2022. In May 2022, a Fulton County grand jury indicted Allen for malice murder (Count 1), five counts of felony murder (Counts 2-6), armed robbery (Count 7), aggravated assault with a deadly weapon (Count 8), aggravated assault predicated on striking Emereje with an object (Count 9), hijacking a motor vehicle in the first degree (Count 10), possession of a firearm during the commission of a felony (Count 11), and two counts of possession of a firearm by a convicted felon (Counts 12-13). At a jury trial in November 2023, Allen was found guilty of all counts. On November 20, 2023, the trial court sentenced Allen to serve life in prison without the possibility of parole for malice murder (Count 1), a consecutive term of twenty years in prison for armed robbery (Count 7), a concurrent term of twenty years in prison for aggravated assault (Count 9), a concurrent term of ten years in prison for hijacking a motor vehicle in the first degree (Count 10), and a consecutive term of fifteen years in prison for possession of a firearm by a convicted felon (Count 13). The other counts were either vacated by operation of law or merged for sentencing purposes. Allen timely filed a motion for new trial, which was amended through new counsel on September 30, 2024. Following a hearing, the trial court denied the motion

insufficient to disprove his affirmative defenses of self-defense and justification and that the trial court erred in failing to merge one count of aggravated assault predicated on beating Emereje into the malice murder count. Because the evidence was sufficient to disprove Allen's affirmative defenses and because there was evidence of a deliberate interval between Allen's striking the victim, which was not necessarily fatal on its own, and his shooting the victim, we affirm.

The evidence at trial showed that during the early morning hours of February 15, 2022, Allen drove a silver Kia Forte, belonging to his girlfriend Shavohn Hill, from their home in Clayton County to downtown Atlanta. Hill testified that a few days later, Allen told her that "he had done something that wasn't righteous." When she asked Allen what he had done, he said, "I'm not going to tell it over the phone." Allen later confessed to her that while he was in Atlanta, he got into a taxi and asked the driver for money. When the driver

for new trial, as amended, on November 25, 2024. Allen timely filed a notice of appeal, and his case was docketed to this Court's April 2025 term and submitted for a decision on the briefs.

refused, Allen "hit him with a tire iron in the eye" and then hit him again with the tire iron. Allen told Hill that he thought the driver "reached back to do something like to get a weapon of his own," so he "dome called that n****r."[2] Allen believed that, as the driver fell to the ground, he pulled off Allen's necklace, on which he wore a knife.

Several residents of an apartment complex near where the attack occurred testified at trial. Randall Mace testified that around 4:45 a.m. he suddenly woke up to "loud yelling in the parking lot." Mace looked outside and saw a white minivan with the driver's side door open and a person standing outside yelling at the driver. Mace then saw the person "repeatedly" hit the driver in the face. He could not count how many times the person hit the driver because it was "nonstop." As he was calling 911, Mace heard a gunshot, which he reported to the 911 operator. Mace watched as the shooter "pulled[ed] the driver out of the [minivan,] … thr[e]w him to the

---

[2] Hill testified that she understood "dome" to mean "head" and that Allen had shot the driver in the head.

ground, and then … got into the [mini]van … and took off out of the parking lot." As the minivan was exiting, Mace realized it was a taxi and provided the taxi's number to the 911 operator. He was not able to see the shooter's face, but he described the shooter as having an average build and about 5'8" or 5'9" and wearing a white hoodie and black jeans.

Michael Potts testified that he was awakened by the sound of a struggle outside his bedroom window. He could hear someone saying, "I don't have any money." He heard a second person "with a deep voice" but could not understand what he said. Potts then heard a gunshot, and, after calling 911, he went onto his deck and saw someone lying on the ground. He also saw a taxi back up, scrape against another car, and "peel[ ] out" of the parking lot.

Chandler Deaver testified that he was awoken in the early morning hours by what he first thought was a gunshot. He heard a man outside his window groaning in pain and saying, "[O]h my God. Oh, my God, please don't kill me." Another man said, "[G]ive me your money." While Deaver's girlfriend was on the phone with a 911

4

operator, they heard what they believed to be a second gunshot that was louder. When Deaver looked outside his window, he saw a body on the ground with blood pooling around the person's head.

Beverly Patrick woke up sometime around 4:00 a.m. after hearing someone crying or moaning outside. She looked out her window and saw a white vehicle and a man hitting someone repeatedly. She could not understand what was being said, but she saw the man who was hitting the other person get out of the vehicle. Then "everything got quiet" before she heard a pop and saw a flash. She called the police and said, "[H]e done shot her," believing the victim was a woman based on the high pitch of the crying. The shooter then pulled the victim out of the vehicle and onto the ground before driving away in the vehicle. She heard the sound of glass falling out of the vehicle's window as the shooter drove away. Patrick described the shooter as having a full head of hair and wearing dark pants and a light-colored shirt.

When officers arrived, they located a body, later identified as 72-year-old Emereje, lying on the street in a cul-de-sac of the

5

apartment complex buildings. Officers also located a neck pillow, lottery tickets, a beanie cap, and broken glass on the ground near Emereje's body. Crime scene investigators recovered one .380-caliber shell casing from the parking lot.

Later that morning, Zaccheus Holt went to a gas station near his house in Clayton County before work. He saw a man in a car there and decided to ask the man for a ride because it was cold and he did not want to wait for the bus. The driver agreed, and during the ride, Holt used cash to purchase a cell phone from him.

Gabriel Martin, who worked at the gas station, testified that Holt was a frequent customer there and that he was able to identify him on the gas station's surveillance video, which was played for the jury at trial. A man, whom Martin had never seen before, came into the store at 6:50 a.m. on the morning of the shooting wearing an Atlanta Braves hat. Although Martin did not see that he had any visible injuries, the man got blood on the floor, a drop or two of blood on the counter, and "a speck" of blood on the window. About ten minutes later, Holt got into a silver car with that man. Martin

6

recalled that Holt had asked about using the store's internet connection so that he could use Cash App to buy a cell phone from the man in the Braves hat.

Law enforcement investigators were able to identify Emereje's cell phone number and located Emereje's cell phone in Holt's possession. Holt admitted to purchasing the cell phone from a man at a gas station in Clayton County. After further investigation, Allen was arrested on February 22, 2022, and officers executed a search warrant at his home. One item of clothing recovered during the search later testified positive for the presence of blood. After agreeing to speak with detectives, Allen claimed that, on the night in question, he got into a bar fight at a strip club in Atlanta and that he then took a taxi to a bar because he was drunk. After that, Allen alleged that he went to Piedmont Park to have sexual relations with a man he met at the bar before driving straight home around 6:00 a.m.

Cell phone records from Allen's phone showed that his phone left his residence around 2:20 a.m. on the morning of the shooting

and arrived in a neighborhood just south of downtown Atlanta around 3:56 a.m. Cell phone records from Emereje's phone showed that his phone was in the area where video surveillance had shown that a man entered his taxi across the street from the Greyhound bus station. Around 4:24 a.m., Emereje's phone moved away from the bus station, but Allen's phone remained near the bus station. Emereje's phone traveled to the location of the shooting and then to the area where Emereje's taxi was later recovered. After that point, both Allen's and Emereje's phones moved together to the gas station where the Kia was captured on camera. The phones continued together for 30 minutes during which time Emereje's phone dialed Allen's phone number. Then, Emereje's phone showed activity in the area where it was later recovered from Holt.

Detectives reviewed license-plate reader cameras in the area to determine the route that Emereje's taxi had taken before and after the shooting. One camera captured the taxi parked on the side of the road as a man approached near a Greyhound bus station in downtown Atlanta. The taxi was then captured at Ivan Allen

Boulevard and at Williams Street shortly before the shooting, traveling eastbound towards the downtown connector. Minutes after the shooting, the taxi was captured by another camera moving away from the crime scene towards Marietta Street. Detectives also identified Hill's silver Kia Forte on a camera just before 4:00 a.m. on the morning of the shooting at the intersection of McDaniel Street and Rockwell Street near the downtown connector. After the shooting, the Kia traveled away from downtown toward Clayton County where a camera captured the Kia driving toward the gas station where Holt met the man from whom he purchased Emereje's cell phone.

Several days after the shooting, a patrol officer located Emereje's taxi backed into a parking lot on Trinity Avenue near the Greyhound bus station. After confirming it matched the description in a BOLO of a white Toyota minivan taxi, the officer secured the vehicle. Looking inside with a flashlight through the broken front passenger window, the officer could see what appeared to be blood on the driver's side and pieces of glass in the passenger seat. Crime

scene investigators later recovered from the vehicle a knife, a knife sheath, a live round of .380-caliber ammunition, and a crowbar. Touch DNA obtained from the steering wheel and the gearshift contained the profiles of both Emereje's and Allen's DNA.

The medical examiner who performed Emereje's autopsy identified 15 to 20 lacerations on Emereje's face caused by blunt-force trauma, three teeth that had been "knocked out," one loose tooth, bruising of his eyes, lacerations and fractures of his fingers, and a gunshot wound to the head. Based on the soot and stippling on Emereje's skin, the medical examiner opined that the barrel of the gun was pressed "tightly against" the skin of Emereje's head at the time it fired. The bullet traveled through Emereje's skull and exited out of his skull on the other side; the wound would have immediately incapacitated Emereje. The medical examiner testified that gunshot wound was certainly fatal, whereas the blunt-force injuries to Emereje's face would have been potentially fatal without medical intervention. Thus, he concluded that the cause of death was a gunshot wound to the head and that other significant

contributors to the cause of death were blunt-force injuries of the head and left hand.

Allen testified in his own defense at trial and admitted striking and shooting Emereje but claimed that he "was a victim of a hate crime" and "fought back" in self-defense. Allen said that he borrowed Hill's car to go to the strip club to establish "an alibi" for his plan to visit an area known for male prostitution in Atlanta. He decided to take a taxi to the area so that he could escape on foot if police showed up. While in the taxi, he said in passing, "Please, Jesus, let there be some cute men out here tonight." Emereje then asked, "Why did you take the Lord's name in vain? Are you a homosexual?" Allen told him it was none of his business and asked, "Well, in your country, there isn't [sic] any homosexuals?" Emereje responded, "If you were in my country, you would be publicly flogged … and … lit ablaze." Allen testified that he "got a little irate" and told Emereje that he was going to report him. The men continued to argue until Emereje pulled over and demanded that Allen get out of his taxi. Allen refused to get out, and the altercation became physical.

According to Allen, Emereje got out of the van with "something in his hand with some prongs on it." Emereje reached inside and grabbed Allen's shirt, and Allen pulled further back into the taxi. Emereje then "swung the weapon at [Allen] twice." The first time Allen blocked it with his forearm, and the second time he blocked it with his right hand, injuring his finger. Allen then got out of the taxi, and Emereje swung a couple more times, hitting Allen in the shoulder. Allen gained control of the weapon and started "frantically hitting him a couple of times, three, four." After Emereje fell back into the taxi, Allen "frantically hit him a couple more times." Allen claimed that Emereje then got control of the weapon and reached "behind his back" and retrieved "a weapon." Allen then "grab[bed] it, push[ed] it out of the way of [his] face, and … hear[d] it discharge."

After Emereje fell to the ground, Allen jumped in the taxi and drove away. He claimed that he did not stay because he was a convicted felon and he did not want his "secret getting out." After he left the taxi in a parking lot near where he had left Hill's Kia, Allen

12

took a phone from the taxi, "thinking it was [his] phone." Allen claimed that his "wound was bleeding profusely, so [he] changed [his] shirt" with "some clothes in the trunk." Then, he "rode around … because [he] was still trying to do what [he] left the house to do[,] … [h]ave sexual relations with someone."

Allen stopped at a gas station to refuel and met Holt, who asked Allen for a ride to the train station. Allen agreed to take Holt partway to the train station, and "[a]fter a little small talk, [Allen] propositioned [Holt] and offered the phone [and the ride] as payment." According to Allen, Holt agreed, and they went to an area and "did what [they] set out to do." At some point "along the way" home, Allen threw the gun that he claimed he had taken from Emereje out of the Kia. Allen admitted to telling Hill that he "did something that wasn't righteous," but denied telling her that he gained control of the weapon, that he robbed Emereje, or that he "dome called" Emereje. Allen also admitted that he lied to investigators during his custodial statement and explained that he lied because he was afraid of Hill "finding out [his] sexuality, [his]

13

secret."

1. We turn first to Allen's assertion that the State failed to disprove his "intertwined" self-defense and justification defenses beyond a reasonable doubt. According to Allen, he was required to defend himself after Emereje found out that Allen was bisexual and attacked him with a hard crowbar-like object and then a pistol. We are not persuaded.

"When a defendant presents evidence that he was justified in using deadly force, the State bears the burden of disproving the defense beyond a reasonable doubt." *Willerson v. State*, 312 Ga. 369, 372 (2021). But it is the role of the jury "to evaluate the evidence and, when doing so, the jury is free to reject any evidence in support of a justification defense and to accept the evidence that the defendant did not act in self-defense." *Russell v. State*, 319 Ga. 556, 559 (2024) (citation and punctuation omitted).

Here, the evidence at trial was sufficient to authorize the jury to find beyond a reasonable doubt that Allen did not act in self-defense. Allen admitted to Hill that he shot someone in the course

14

of a robbery, and multiple eyewitnesses testified to actions that supported an attempted robbery rather than actions taken in self-defense. Although Allen testified that Emereje attacked him first, the jury was free to reject that self-serving testimony, especially since it was inconsistent with Allen's admissions and the eyewitnesses' testimony. See *Holloway v. State*, 320 Ga. 668, 670 (1) (2025) (although defendant testified to a different version of events, the jury was free to reject that self-serving testimony and find him guilty beyond a reasonable doubt of malice murder).

2. Allen also asserts that the trial court erred by failing to merge the second aggravated assault count, predicated on beating Emereje (Count 9), into the malice murder count because there was no deliberate interval between the striking of Emereje, which Allen alleges was itself fatal, and the gunshot. We disagree.

As an initial matter, we note that the indictment alleged that Allen committed malice murder by shooting Emereje with a firearm, and the aggravated assault charge was based on striking Emereje

in the head with an unknown object.[3] Thus, the charges at issue here

are not based on the same alleged conduct.[4] See *Sillah v. State*, 315

Ga. 741, 758 (2023) ("Typically, the same conduct refers to acts

committed against the same victim at the same time." (cleaned up));

*Lynn v. State*, 310 Ga. 608, 611 (2020) (where the aggravated assault

count was based on hitting the victim in the head with a baseball

bat, which was "the very act that caused her death," the aggravated

assault count should have merged with the malice murder

---

[3] Count 1 of the indictment charged that Allen "did unlawfully and with malice aforethought, cause the death of [Emereje], a human being, by shooting him with a firearm." Count 9 of the indictment charged that Allen "did unlawfully commit an assault upon the person of Frederick Greene Emereje by striking him about the head with an object or objects unknown to the Grand Jurors at this time, and said object or objects being among those that, when used offensively against a person, are likely to result in serious bodily injury."

[4] Typically, the merger analysis would end here where, as alleged in the indictment, the malice murder count is based on different conduct that the aggravated assault count. However, we construe Allen's argument as -- despite the indictment alleging different conduct to support the malice murder and aggravated assault convictions -- the State presented evidence that the malice murder was accomplished through beating Emereje such that the aggravated assault conviction should have merged. See *Starks v. State,* 320 Ga. 300, 305 (2024) (Under the required-evidence test, "when the same conduct of an accused may establish the commission of more than one crime, the accused may be prosecuted for each crime, but the accused may not be convicted of more than one crime if one crime is included in the other. A crime is included in the other when it is established by proof of the same or less than all the facts or a less culpable mental state than is required to establish the commission of the other crime.") (cleaned up).

conviction).

"To authorize separate convictions for aggravated assault and malice murder of a single victim[,] … the trial evidence must show that the defendant committed an aggravated assault independent of the act that caused the victim's death." *Stryker v. State*, 318 Ga. 769, 783 (2024) (cleaned up). This showing requires evidence that there was both a "deliberate interval" between the infliction of two separate wounds and that one of the wounds was "fatal" while the other was "non-fatal." Id. (cleaned up).

Although the trial evidence may have been conflicting, evidence from at least some of the apartment residents showed that there was at least some period of time between when Allen struck Emereje while attempting to rob him and when he switched weapons and then shot Emereje with the gun pressed against Emereje's head. One witness testified that after Allen beat the victim, Allen got out of the vehicle and "everything got quiet," and then she heard a gunshot. Other evidence was also presented that during that interval, Emereje begged for his life and stated that he

17

did not have any money, at which time Allen dropped the crowbar and switched weapons to shoot Emereje in the head with a firearm. Thus, there was evidence of a deliberate interval between Allen's beating and subsequent shooting of Emereje. See *Byers v. State*, 311 Ga. 259, 267 (2021) (convictions did not merge when there was evidence of a deliberate interval between the blows inflicted on the couch and the blow inflicted in the yard, such that the jury could infer that there was a completed, non-fatal assault, followed by a deliberate interval and a later battery that was the proximate cause of death); *Price v. State*, 313 Ga. 578, 582–83 (2022) (where the evidence showed a pause sufficient to constitute a deliberate interval between the two gunshots, the trial court was permitted to conclude that the aggravated battery was completed before the aggravated assault took place).

Moreover, the evidence presented at trial showed that Allen's beating Emereje and shooting him resulted in different injuries. The medical examiner's testimony was clear that the blunt-force injuries were not necessarily fatal, whereas the gunshot wound was clearly

18

fatal. The medical examiner explained that even though the lacerations to Emereje's head would have resulted in a lot of blood loss, none involved factures of the skull, and thus were only potentially fatal. Ultimately, the medical examiner's report concluded that the cause of death was the gunshot wound to the head, with blunt-force injuries of the head and left hand as conditions that contributed to the cause of death. Accordingly, the trial court did not err in failing to merge Count 9 into the malice murder count. See *Hightower v. State*, 304 Ga. 755, 760 (2018) (where two rounds of gunshots were separated by a deliberate interval and resulted in different injuries, the aggravated assault and aggravated battery counts did not merge); *Edwards v. State*, 301 Ga. 822, 828 (2017) (aggravated assault and malice murder counts did not merge where medical examiner testified that external injuries on victim's neck were separate from fatal injuries to the victim's head).

*Judgment affirmed. All the Justices concur.*

19